# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ORIN S. JOHNSON, et al.,      )
                                )
            **Plaintiffs,**     )
                                )
**v.**                              )
                                )      No. 08-2198-CM-DJW
**SIMONTON BUILDING PRODUCTS,** )
**INC., et al.,**              )
                                )
          **Defendants.**     )
_____)

## MEMORANDUM AND ORDER

Plaintiffs Orin S. Johnson, Gary A. Jones, and Am-Rad, Inc., bring this action against defendants Simonton Building Products, Inc.; Simonton Holdings, Inc.; and Fortune Brands, Inc., alleging breach of contract (a non-disclosure, non-use agreement), unjust enrichment, and misappropriation of trade secrets. The case is before the court on Defendants' Motion for Summary Judgment (Doc. 163). Also pending before the court are Plaintiffs' Motion to Exclude Expert Witness Terry Faddis and his Report (Doc. 156), Defendants' Motion to Exclude Expert Report and Testimony of James Kernell (Doc. 158), and Plaintiffs' Motion to Exclude the Testimony and Report of Defendants' Expert Steve Browne (Doc. 159). For the following reasons, the court grants the motion for summary judgment and makes additional orders as set forth below.

## I.    Factual Background[1]

---

[1] The court construes the facts in the light most favorable to the non-moving party pursuant to Fed. R. Civ. P. 56. The court has reviewed and combined the facts proposed by both parties, (including those contained in defendants' memorandum (Doc. 164), plaintiffs' memorandum in opposition (Doc. 181), and defendants' reply (Doc. 185)), and has included only those facts that are relevant, material, and properly supported by the record.

Because this case deals with the technology involved in producing vinyl windows, some background is helpful. The conventional method for making a vinyl window frame involves cutting four members to predetermined lengths; placing the cut members into a welding machine such as the Urban AKS 8000; squaring the members up with a spacing plate; and clamping the members into place. The members are then moved into contact with a heat plate until they are heated to a temperature high enough to soften the plastic but not so high as to burn or char it; the heat plate is removed and the members are put in contact with each other for a sufficient time to form a "welded" joint. One disadvantage to this method is that "flash" created at the joint must be removed later, after the weld has cooled.

Plaintiffs Johnson and Jones, both Minnesota residents, are named as the inventors on two patents, ("the '720 Patent" and "the '447 Patent"), of which they assigned ownership to plaintiff Am-Rad.[2] The '720 Patent discloses several methods of making windows and related products using radiant heat rather than the conventional heating method. The patent also discloses methods for removing flash simultaneously with the welding process—by means of a clamping head with one or more cutting edges attached. The '447 Patent discloses apparatuses for holding frame members, one or more of which has a cutting edge to remove excess flash as the members are joined together.

Former plaintiff Millennium Marketing Group, Ltd. ("Millennium") is the Kansas-based marketing agent for Am-Rad as well as for Johnson and Jones. Millennium prepared and circulated to various window companies a marketing prospectus dated August 21, 2003, entitled "Am-Rad,

---

[2] The two patents are (1) United States Patent No. 5,855,720 entitled, "Clamping Head for Use in Joining Plastic Extrusions and Method Thereof" ("the '720 Patent"); and (2) United States Patent No. 5,902,447 entitled, "Deflashing Head and Method for Joining Plastic Extrusions" ("the '447 Patent").

Inc.'s Flash-Free™ Thermoplastic Welding System, *Newly patented technology available for licensing.*[3]  (Doc. 165-9, at 2.)

Defendant Simonton, a vinyl window manufacturer headquartered in West Virginia, received the August 21, 2003 marketing prospectus.[4]  In 2004, Simonton engaged in discussions with Millennium for the purposes of seeking intellectual property licensing protection, marketing consultation and/or procurement of venture capital for promotion of the product titled the "Flash-Free™ Thermoplastic Welding System."

On April 8, 2004, Millennium (acting for plaintiffs) and Simonton executed a one-page "Non-Disclosure and Non-Use Agreement" (the "NDNU Agreement") to protect any confidential information exchanged between the parties during negotiations.[5]  (Doc. 164-11.)

Simonton claims its employees—Billy Green in particular—began initial work with radiant heat technology to determine if the technology could be successfully applied to the production process.[6]

---

[3]  Millennium prepared and circulated a second marketing prospectus dated January 10, 2006.

[4]  Defendant Simonton Building Properties, Inc., is a wholly-owned subsidiary of defendant Simonton Holdings, Inc., which is itself a wholly-owned subsidiary of Fortune Brands Home and Hardware, LLC, which is not a party to this action, but which is a wholly-owned subsidiary of defendant Fortune Brands.  References to "Simonton" are meant to indicate Simonton Building Properties, Inc.

[5] By its terms, the NDNU agreement protected "Confidential Information," defined as "all proprietary information used by or belonging to or relating to one of the parties, the invention, business or services which (1) is not generally known to the public and (2) is disclosed in connection with [the] discussions" in which plaintiffs and Simonton were engaged.  The NDNU expressly provided that the obligations of confidentiality "shall not prevent a party from using or disclosing any information which is independently developed by the receiving party without access to the disclosing party's 'Confidential Information.'"  (Doc. 164-11, at 2.)

[6]  Simonton employee Billy Green worked on modifying a single-point welding machine to
(continued...)

-3-

Just over seven months after entering the NDNU, Simonton, on the one hand, and Johnson, Jones, Am-Rad, and Millennium, on the other hand, entered into a License Agreement (the "License Agreement") for the license and use of Plaintiffs' Flash-Free Welding Technology described and claimed in Am-Rad's '720 Patent and '447 Patent. (Doc. 164-14.)

The License Agreement, executed on or about November 21, 2004, and amended effective July 15, 2005, granted Simonton exclusive license to use plaintiffs' welding technology in the window-making industry in exchange for a payment to Johnson and Jones. Additionally, the License Agreement provided that, upon complete payment under the terms of the Agreement, the parties would have two years within which to form a joint venture to market the Flash-Free Welding Technology to the window-making industry. The terms of the joint venture agreement directed that any enhancements or additional patents Simonton acquired "as the result of placing into production products utilizing the Flash-Free Welding Technology which incorporates the claims of the patents . . . and improvements thereto" would be contributed to the joint venture, to be shared on a 50/50 basis. (Doc. 164-14, at 8.)

The License Agreement acknowledged Simonton's right to develop other "joining technologies" for the purpose of manufacturing windows and doors "which may give rise to

---

[6] (...continued)
join lineal members using radiant heat. Green testified that this involved determining the appropriate material for the heat plate; etching or routing the surface of the heat plate; and testing for optimal distances and temperatures. Through trial and error, Green, with the possible involvement of other Simonton employees and alleged involvement of plaintiffs, successfully modified a single-point welding machine to create strong welds with radiant heat. There is dispute about whether and to what extent plaintiffs were involved in or contributed information regarding this initial work. The testimony of Simonton employees, in particular Green, Tim Kownacki, Charles Kownacki, and Justin Wager, all indicate this work was done by Simonton independently, through trial and error, and that plaintiffs were not involved and did not provide any information or assistance. Plaintiffs maintain that they divulged all the parameters and specifications for how to incorporate and use the radiant heat technology to Simonton employee Cindy Dotson.

technologies that compete, in whole or in part, with plaintiffs' Flash-Free Welding Technology," provided that Simonton did not infringe on the Am-Rad patents. All other such joining technology that Simonton might develop was to be the sole and separate property of Simonton, and plaintiffs agreed they had no right, title, claim, or interest in it by reason of the Licensing Agreement or the joint venture. The parties further agreed that "[i]f an improvement is made by any party to this agreement to the Flash-Free Welding Technology worthwhile of applying for a new patent," that party shall apply for the new patent, shall pay all expenses, and shall be named the owner of the new patent. Pursuant to the terms of the License Agreement as amended, Simonton paid Johnson, Jones, and Am-Rad a total of Five Hundred Sixty-Five Thousand Dollars ($565,000). Johnson, Jones, and Am-Rad were represented by counsel at all times during the negotiation and execution of the License Agreement.

After entering the License Agreement, Simonton continued research and development in its Erie, Pennsylvania, facility. Simonton claims that its team of employees spent many months working on modifying a conventional 4-point welding machine—the Urban AKS 8000—to use in production. The team was successful in modifying heat plates for radiantly heating the weld joints. However, the team was never successful in getting the pinch point to come together and pinch off excess flash in the weld, and ultimately determined that incorporating that technology was impossible. Still seeking, however, an efficient method for creating aesthetic welds, one member of Simonton's team, Charles Kownacki, went "down a whole new path." (Doc. 164-16, at 27.) Rather than focus on shearing off excess flash, Kownacki began focusing on having a precise amount of material in the machine, so that, when heated and forced together, only a certain volume of melted material came together for the weld so no shearing was necessary. This Precision Controlled Welding Technology required the operator to have more control over the machine. To achieve this

end, the team focused on modifying the Urban AKS 8000, including by changing out the step actuators for "servo motors." The team used "design of experiments" (DOEs) to determine optimum operating parameters for the new technology. The Precision Controlled Welding Technology was first introduced in a production line in West Virginia in November 2005.[7]

Plaintiffs do not dispute the research and development that occurred at Simonton's facility, but maintain that plaintiffs were involved and participated in jointly developing this technology.

In December 2005 and again in December 2006, Simonton filed applications for United States patents ("the '563 Application" and "the '456 Application"), which do not name Johnson or Jones as inventors, but only name Charles Kownacki.[8] Neither Johnson, Jones, nor Am-Rad has paid any of the expenses or filing fees incurred in connection with applying for and prosecuting the Simonton applications.

In support of the counts remaining in plaintiffs' complaint, plaintiffs allege that high-level Simonton employees including John Brunett and Sam Ross promised plaintiffs that, in exchange for plaintiffs' assistance, plaintiffs would share equally in the value of any resulting technology. Plaintiffs assert that these promises were made after the License Agreement was executed, and that they were constantly reassured that they were "partners," "in it together," and "would be included 100% on . . . any additional patents." (Doc. 18, at 5.) Based on these misrepresentations, plaintiffs assert that they divulged trade secrets and confidential information to defendants; expended significant efforts in assisting defendants with the development of the Precision Controlled Welding

---

[7] Subsequently, Simonton decided not to continue expanding the use of this technology, and has since removed the Precision Controlled Welding Technology from its production lines.

[8] The '563 Application, entitled "Method and Apparatus for Window Manufacture," was assigned Serial No. 11/322,563. The '456 Application, entitled "Fenestration Product and Method and Apparatus for Manufacture," was assigned Serial No. 11/640,456. At the time of the parties' briefing, both applications were still pending in the U.S. Patent and Trademark Office (the "PTO").

Technology; and jointly developed trade secrets with Simonton that Simonton misappropriated in filing its patent applications.[9]

In the instant motion, defendants argue that summary judgment is appropriate because plaintiffs' claim for unjust enrichment/quantum meruit is barred based on the undisputed facts, and plaintiffs cannot meet their burden of proving either a breach of the Non-Disclosure Non-Use Agreement or a misappropriation of trade secrets.

## II.     Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v.*

---

[9] Plaintiffs' First Amended Complaint raised eleven causes of action, six of which this court dismissed as unripe in an order dated January 6, 2009 (Doc. 43.)

*Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III. Discussion

The court will address each of the three claims in turn—breach of the NDNU Agreement, unjust enrichment, and misappropriation of trade secrets. As required, the court will address related choice of law issues.

### A. Breach of the NDNU Agreement

Defendants assert that plaintiffs cannot produce evidence sufficient to prove that plaintiffs disclosed confidential information to Simonton under the NDNU Agreement, or that Simonton disclosed that information to others. Plaintiffs offer no response to this argument. They fail to controvert defendants' statements of fact relating to the scope of the NDNU Agreement, and they offer no evidence that would raise any genuine dispute as to any material fact. Therefore, the court grants summary judgment to defendants on this claim.

### B.    Unjust Enrichment

In relation to plaintiffs' unjust enrichment claim, the court first addresses the choice of law issue, and then analyzes defendants' arguments that, *inter alia*, the claim is barred by contract or by collateral estoppel.

*Choice of Law.*

Plaintiffs believe that their unjust enrichment claim should be governed by Minnesota law. Defendants believe West Virginia law applies. When sitting in diversity, the court applies the choice of law provisions of the forum state. *Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007). Kansas follows the factors set forth in the Restatement (Second) of Conflict of Law, § 221 to determine the law governing a quasi-contract claim of unjust enrichment. *See Tradesmen Int'l, Inc. v. U.S. Postal Serv.*, 234 F. Supp. 2d 1191, 1204 (D. Kan. 2002); *Commander Prop. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 541 (D. Kan. 1995). The parties agree that the relevant factors for the court's consideration are: (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship; (b) the place where the benefit or enrichment was received; (c) the place where the act conferring the benefit or enrichment was done; (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment. These contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement (Second) of Conflict of Law, § 221.

Although plaintiff Am-Rad is a Minnesota corporation and plaintiffs Johnson and Jones are Minnesota residents, they marketed their technology to Simonton, headquarted in West Virginia, and entered into agreements with Simonton there. Plaintiffs maintain that the phone calls through which

they provided a benefit to defendants were made from Minnesota, and plaintiffs' flights to Simonton's facilities were primarily purchased in and originated from Minnesota. These contacts, and the others cited by plaintiffs, do not reveal a relationship to Minnesota sufficient to justify applying the law of that state. Six of plaintiffs' nine trips to Simonton's facilities were to West Virginia. And although the work actually performed on the welding equipment took place largely in Pennsylvania, Simonton installed and used the disputed technology in its production lines in West Virginia, and windows resulting from use of the disputed technology would have been made, assembled, and sold in West Virginia. Because West Virginia is the state with the most significant relationship to the unjust enrichment alleged here, West Virginia law governs the unjust enrichment claim.

*Claim barred by Contract*

Plaintiffs assert that defendants were unjustly enriched because plaintiffs expended significant efforts in the development of the Precision Controlled Welding Technology. And although plaintiffs were not notified that Simonton was seeking any patents, plaintiffs believed that they were entitled to share in the Precision Controlled Welding Technology and were assured by Brunett and Ross that they would be named as inventors on the applications. Plaintiffs contend that their unjust enrichment claim is not barred by the License Agreement because plaintiffs' efforts in assisting with the development of the Precision Controlled Welding Technology were based, not on the terms of the License Agreement, but instead on oral reassurances by Simonton executives. Defendants argue, among other things, that there can be no claim for unjust enrichment where an express contract already exists that governs the subject matter at issue.

In addition to asserting that Simonton executives promised they would share in the result in return for their assistance, plaintiffs claim that the work done in Erie, Pennsylvania resulting in the

-10-

Precision Controlled Welding Technology was not independent, but was already disclosed in plaintiffs' patents, or was accomplished with plaintiffs' assistance, and/or was a product of joint discussions. Plaintiffs maintain, among other things, that (1) Kownacki's approach to aesthetic welds was not a "new" method, but was disclosed in the '720 patent; (2) plaintiffs had already provided Simonton employees with all initial operating parameters for use of and modification of the welding machine; (3) additional modifications were not solely defendants' employees' ideas, but were the product of "joint discussions" between plaintiffs and defendants' team members; (4) although plaintiffs did not physically participate in the DOEs, they were involved, and provided guidance over the phone; and (5) the technology described in Simonton's '563 and '456 Applications merely refined the apparatus, process, and technology described in plaintiffs' patents.

In support of these arguments, plaintiffs Johnson and Jones point to the number of visits they made to defendants' facility and the number and length of phone calls with defendants' employees. It is uncontroverted, for purposes of this motion, that plaintiffs made a total of nine trips to defendants' facilities, eight of which occurred after the parties entered the License Agreement.[10] It is also uncontroverted for purposes of this motion, that plaintiffs had a total of at least 112 phone calls to or from Simonton over the relevant two-year time period. Plaintiffs also point to plaintiff Johnson's statements in his affidavit and deposition that plaintiffs' involvement with the Precision Controlled Welding Technology was a product of separate and subsequent oral misrepresentations by Simonton executives.

Clearly, there is dispute as to whether plaintiffs assisted in the development of the Precision

_____

[10] The first of these visits took place in October, 2005, before the Licensing Agreement was executed, and the last of these was to Fortune Brands in December 2006 to discuss settlement of this dispute.

Controlled Welding Technology.  But this question of fact is only relevant to whether the plaintiffs are entitled to share in the technology under the amended License Agreement, or whether, under that Agreement, it is Simonton's alone.  Plaintiffs' unjust enrichment claim fails because the claim for involvement with the Precision Controlled Welding Technology (thus the claim for entitlement to the patents and profits) is grounded in the parties' contractual relationship, and plaintiffs fail to establish otherwise.

The relationship between plaintiffs and defendants described and governed by the License Agreement includes (1) the Am-Rad Flash-Free Technology; (2) related technologies – in the form of enhancements or improvements to the Am-Rad technology – that would be contributed to the joint venture; and (3) "other joining technologies" that Simonton might develop so long as they did not infringe on the Am-Rad patents.

Under this court's reading, the subject matter of the License Agreement as amended contemplates the complained-of technology, either by including it in a joint venture or excluding it as "other joining technology."  The court agrees with defendants that plaintiffs fail to provide evidence of an implied contract that would take this matter outside that contemplated by the License Agreement.[11]  And, promises or not, the question of whether plaintiffs are entitled to share in the Precision Controlled Welding Technology is governed by the contract between the parties.  Any

---

[11] "An implied contract 'presupposes an obligation arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.' [quotations omitted].  However, '[a]n implied promise must be as distinctly alleged in a declaration as an express one.'"  *Marshall v. Elmo Greer & Sons, Inc.*, 456 S.E.2d 554, 557 (W. Va. 1995).  Other than plaintiff Johnson's affidavit (Exhibit C, at ¶ 12) and deposition (Exhibit B, at 73–74), there is no evidence that the terms of such promise covered subject matter not covered by the License Agreement, nor do plaintiffs offer evidence probative of mutual agreement.  Further, the express language of the License Agreement precludes amendment of the Agreement without a writing executed by all parties.  (Doc. 164-14, at 6.)

claim of entitlement to that technology, including a claim for unjust enrichment, must therefore begin with that contract. *See Marshall*, 456 S.E.2d at 557; *Elliott Ind. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005). Plaintiffs cannot pursue an equitable claim where an express contract governs the subject matter. The district court therefore grants summary judgment to defendants on plaintiffs' unjust enrichment claim.

*Claim barred by Collateral Estoppel*

This result is supported, although not required, in light of the decision in *Johnson v. Ross*, Case No. 6:08-cv-00313, 2009 WL 4884374 (S.D. W. Va., Dec. 10, 2009).

Plaintiffs Johnson, Jones, and Am-Rad filed a lawsuit on May 14, 2008, in the United States District Court for the Southern District of West Virginia (the "West Virginia District Court") against Sam Ross, the owner of Simonton, on these facts. In an amended complaint, filed August 12, 2009, plaintiffs alleged that, "separate and independent of the License Agreement, Ross requested that Plaintiffs provide Confidential and Trade Secret Information, services and efforts . . . in connection with the research, production, and development of the Am-Rad Flash-Free Thermal Plastic Welding System." (Doc. 110, at 7.) Plaintiffs' sole claim was that Ross was unjustly enriched by the trade secret information plaintiffs provided, the services and efforts plaintiffs expended in developing the technology, the technology itself, and the increased value Ross received in the sale of the Simonton entities to Fortune Brands on account of the technology.

In his motion for summary judgment, Ross raised two grounds: (1) plaintiffs' unjust enrichment claim is barred by the License Agreement; (2) Ross cannot be held liable as a shareholder for acts he took on Simonton's behalf. In an opinion dated December 10, 2009, Chief Judge Joseph Goodwin granted summary judgment in favor of Ross. After setting out the arguments and law essentially as set out by this court in the proceeding section, the court held: "Here,

-13-

plaintiffs' unjust enrichment claim is precluded because an express contract governs this identical subject matter."  2009 WL 4884374, at *5 (noting also that, actually, "the crux of plaintiffs' claim is that Simonton (through Ross) violated the terms of the License Agreement").  Additionally, the court held that even if the plaintiffs were able to pursue an unjust enrichment claim, Ross would not be subject to liability under these facts.

Collateral estoppel will bar a claim if four elements are met: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  *Holloman v. Nationwide Mut. Ins. Co.*, 617 S.E.2d 816, 821 (W. Va. 2005); *Moss v. Kopp*, 559 F.3d 1155, 1161–62 (10th Cir. 2009) (citing *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995)).

There can be no dispute that, although this action raises the claim against the Simonton entities rather than Ross, the issue is identical: whether plaintiffs' unjust enrichment claim is barred by the License Agreement.  And Ross and Simonton are in privity for purposes of these actions:  Ross was the principle founder and leader, director, chairman, and chief executive officer of Simonton's parent, as well as the chairman of Simonton's board.  2009 WL 4884374, at *2.  Plaintiffs had a full and fair opportunity to litigate this issue—and did litigate this issue—in the West Virginia District Court.  The issue, however, is whether the decision constitutes a final adjudication on the merits.

This court may not give preclusive effect to a judgment that, under the law of the rendering

-14-

state, would not be given preclusive effect.[12] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470

U.S. 373, 382–83 (1985); *Meindl v. Genesys Pac. Tech., Inc.* (*In re Genesys Data Tech., Inc.*), 204

F.3d 124, 128 (4th Cir. 2000). Therefore, while Chief Judge Goodwin's decision does not bar

plaintiffs' claim due to its status on appeal to the Fourth Circuit Court of Appeals, *see* Case No. 10-

1046, it supports this court's identical ruling on the identical issue.

### C.    Misappropriation of Trade Secrets

The court turns to plaintiffs' final claim, that of misappropriation of trade secrets. The court

looks at choice of law issues, the applicable statutory definitions and elements of the claim, and

---

[12] The preclusive effect a federal court gives to a federal court judgment is a question of federal law. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001); *Matosantos Comm'l Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1207–08 (10th Cir. 2001). The federal rule at least for the *claim-preclusive* effect of a federal diversity judgment is to adopt "the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek*, 531 U.S. at 508; *but see Matosantos*, 245 F.3d at 1207 (recognizing the distinction between *res judicata* (*i.e.*, claim preclusion) which was at issue in *Semtek*, and collateral estoppel (*i.e.*, issue preclusion) which was not, and declining to decide how preclusive effect should be evaluated in collateral estoppel cases); *see also In re Universal Serv. Fund Tel. Billing Practices Lit.*, 300 F. Supp. 2d 1107, 1134 (D. Kan. 2003) (same).

While the majority of federal and state courts hold that a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes, *Rhoten v. Dickson*, 223 P.3d 786, 798 (Kan. 2010) (citing, *inter alia*, *Roberts v. Anderson*, 66 F.2d 874, 875–76 (10th Cir. 1933)), a minority of states have concluded that a lower court judgment is not "final" for purposes of res judicata or collateral estoppel when it is on appeal. *See Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1040 (MD. App. 2004) (string-citing cases from jurisdictions so holding, including California, Virginia, Georgia, and Louisiana.) It is not clear that West Virginia is among these, but there is indication that, if faced with the issue, West Virginia might join this minority. In *Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co.*, 513 S.E.2d 692 (W. Va. 1998), the West Virginia Supreme Court was required to determine the preclusive effect of a New York judgment; it therefore applied New York law. *See* 513 S.E.2d at 704. But in dicta, the court noted that, "[a]lthough this Court has never expressly held that a judgment pending appeal is not final for res judicata and collateral estoppel purposes, it intimated as much in *Flanagan v. Gregory & Poole, Inc.*, 67 S.E.2d 865 (W. Va. 1951)." *Id.* at 703. Indeed *Flanagan* discourages an estoppel argument where, although plaintiff had recovered damages against the corporate defendant in a separate action, a writ of error was granted by the West Virginia Supreme Court and was still pending. 67 S.E.2d at 872.

-15-

specifically analyzes whether plaintiffs offer sufficient, admissible evidence supporting the existence of trade secrets in this case.

*Choice of Law*

Plaintiffs pleaded violations of the Trade Secrets Acts of Minnesota, Kansas, and West Virginia, but are pursuing only one claim for misappropriation of trade secrets. The parties disagree about which state's law applies to the claim: plaintiffs argue Minnesota law governs, defendants argue West Virginia. Neither party suggests that Kansas or Pennsylvania law should apply.

For tort actions, Kansas applies the law of the state where the tort was committed. *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985). "Under this rule, the tort is deemed to have occurred where the wrong was felt." *St. Paul Furniture Mfg. Co. v. Bergman*, 935 F. Supp. 1180, 1187 (D. Kan. 1996). Having alleged a financial injury and residing in Minnesota, plaintiffs' financial injury was necessarily felt in Minnesota. *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F. Supp. 2d 1269, 1276 (D. Kan. 1998); *see Thomas v. Talbott Recovery Sys., Inc.*, 982 F. Supp. 794, 798 (D. Kan. 1997) ("Because plaintiff alleges financial injury in this case, he felt the wrong in Kansas, where he is a resident."). Thus, plaintiffs' claims are properly evaluated under the Minnesota Uniform Trade Secrets Act. *See Wempe v. Sunrise Med. HHG, Inc.*, 61 F. Supp. 2d 1165, 1172 n.3 (D. Kan. 1999).

Regardless, the elements of a successful misappropriation of trade secrets claim are the same under the laws of Minnesota and West Virginia: both states have adopted the language of the Uniform Trade Secrets Act. *See* Minn. Stat. Ann. § 325C.01; W. Va. Code § 47-22-1. Under both codes, misappropriation requires:

> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who[:]
>> (A) used improper means to acquire knowledge of the trade secret; or

-16-

(B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of the discloser's or user's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Minn. Stat. Ann. § 325C.01; *see also* W. Va. Code § 47-22-1.

A trade secret is defined as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id*.

"Improper means" include misrepresentation, as alleged here. *Id*.

Moreover, "[t]he existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained." Minn. Stat. Ann. § 325C.01.

*Analysis*

Defendants assert that plaintiffs cannot meet the burden of proof required to establish (1) the existence of trade secrets; (2) that plaintiffs disclosed trade secrets to Simonton; (3) that defendants acquired plaintiffs' trade secrets by improper means; (4) that defendants made unauthorized use or

-17-

disclosure of plaintiffs' trade secrets, or (5) that plaintiffs took efforts reasonable under the circumstances to maintain the information as secret. The court finds that, based on the evidence presented and viewing that evidence in the light most favorable to plaintiffs, there exists a genuine issue of material fact as to the second, third, fourth, and fifth elements. However, in determining whether defendants are entitled to judgment as a matter of law, the court must first determine whether plaintiffs have alleged evidence sufficient to establish a genuine dispute of material fact regarding the existence of a trade secret. *See, e.g., Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 701 (Minn. 1982); *see also McGough v. Nalco Co.*, 496 F. Supp. 2d 729, 739 (D. W. Va. 2007).

"Whether information constitutes a trade secret presents a mixed question of fact and law. 'The existence of a trade secret depends on three factors: (1) the information must not be generally known or readily ascertainable, (2) the information must derive independent economic value from secrecy, and (3) the party asserting the misappropriation must have made reasonable efforts to maintain the secrecy of the item.'" *Naterra Land, Inc. v. Dingmann*, No. 27-CV-05-16624, 2006 WL 1767967, at *5 (Minn. Dist. Ct. June 26, 2006) (quoting *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1178 (D. Minn. 2003) (applying Minnesota law); *see also* Minn. Stat. Ann. § 325C.01 (setting out definition); *Electro-Craft v. Controlled Motion, Inc.*, 332 N.W.2d 890, 898–99 (Minn. 1983) (noting same).

As of the current briefing, plaintiffs identify the following four subjects, grossly simplified,

as trade secrets:[13] (1) "the method";[14] (2) the use of servo motors;[15] (3) the etching and stamping of heat plates;[16] and (4) the "weld strength and non-touch systems"[17]

---

[13] (Doc. 181, at 78, noting that "[t]he trade secrets identified by [p]laintiffs are listed in [Doc. 181, at 58, paragraphs] 50, 51, 52 and 53.")

[14] More specifically, "an enhanced and improved method of welding vinyl frame members together so as to minimize or eliminate flash and waste and increase the precision of the weld. More specifically, welding vinyl windows together to within at least ± 0.030 inches of the desired finish height and width by: (a) cutting the frame members to within ± 0.025 inch of a desired cut length; (b) placing the frame members in clamp jaws with the ends of the frame members extending from the edge of the clamp jaws by 0.025 to 0.100 inches of a radiant heater; (c) moving the ends of the frame members into spaced apart proximity and within 0.025 to 0.150 inches of a radiant heater at; (d) a temperature between 900 and 1300 degrees F; (e) for a period of 4-15 seconds; (f) removing the radiant heaters from proximity to the frame member, and (g) within 0.20 to 1.5 seconds thereafter, moving the frame members into contact with each other for: (i) [*sic*] 4 to 15 seconds with: (j) a joint interference of between 0.010 and 0.015 inches so as to weld the frame members together. ([Doc. 164-38] Ex. 37, Plaintiffs' First Supplemental Answers and Objections to First Set of Interrogatories, ¶1)." (Doc. 181, at 57.)

[15] More specifically, "Using [servo motors] or other precision indexing motors to move (one or) multiple frame ends into proximity to one another and then into contact with one another in the above method so as to weld (one or) multiple frames together simultaneously . . . . [Doc. 164-38] Ex. 37, Plaintiffs' First Supplemental Answers and Objections to First Set of Interrogatories, ¶ 2-3." (Doc. 181, at 57.)

[16] Specifically, "to create more surface area so as to dissipate heat faster, thereby lowering the time cycle of the process. . . . [Doc. 164-29] Ex. 28, Plaintiffs' Second Supplemental Answer to Defendants' First Interrogatory ¶2(c). More specifically, the method of etching and stamping that utilizes a stamping dye and/or the use of a router bit to rough up the surface area of the heat plates, with said router being used around the edges from right to left or corner to corner, and then changed 90 degrees to repeat the process. *Id*." (Doc. 181, at 57–58.)

[17] More specifically, "as the weld strength is a byproduct of using the process and technology correctly, it is key to obtain the correct initial distances to provide three times the weld

(continued...)

The court assumes without deciding that plaintiffs can claim trade secrets that were plaintiffs' own, as well as secrets "jointly developed" with defendants.[18]  However, defendants argue, convincingly, that the information plaintiffs claim as a trade secret was either (1) already publicly disclosed in the Am-Rad patents or in the plaintiffs' marketing prospectus; or (2) is generally known or readily ascertainable.  Specifically, defendants assert that:

1.        Each part of the multi-part method for welding windows to within $\pm 0.030$ inches of the desired finish height and width described by plaintiffs fails to meet the definition of a trade secret because each step, measurement, and range is (1) generally set out in the Am-Rad patents, and (2) readily ascertainable by trial and error, all of which work was done by Simonton employees.  Additionally, defendants rely on the report of their expert, Terry Faddis, a professor of mechanical engineering with fifteen years of experience in the industry

---

[17] (...continued)
strength of conventional touch welding.  [Doc. 164-29] Ex. 28, Plaintiffs' Second Supplemental Answer to Defendants' First Interrogatory at ¶2(d).  These distances are of no concern in the conventional touch welding systems.  To obtain the correct initial distances between the heat plates and the ends of the members, the machine is spaced back to where the ends of the members are not charred or burned, ultimately decreasing the time cycle of the process.  *Id.* Once the distance is set, the time of the heat cycle and the heat temperature can then be varied to obtain a weld strength three times the American Architectural Manufacturers Association ("AAMA") standard.  *Id.*"  (Doc. 181, at 58.)

[18]  The parties disagree on this point: defendants assert that Judge Waxse's July 9, 2009 Memorandum and Order found that plaintiffs' "trade secrets claims are based on trade secrets possessed by Plaintiffs and not on trade secrets jointly developed by Plaintiffs and Defendants."  Defendants argue this operates as "the law of the case" and precludes plaintiffs from asserting misappropriation of any trade secrets alleged to have been developed by plaintiffs and defendants jointly.  The court believes that this may be a misreading of the complaint, but regardless it appears in Judge Waxse's Order only for the limited purpose of explaining why plaintiffs would not be permitted to respond to defendants' interrogatories by asserting that defendants had sole possession of the requested information.  Indeed, the pretrial order in this case, which supersedes all pleadings and controls the course of the case, acknowledges plaintiffs' contention that the alleged trade secrets include those allegedly developed by plaintiffs and defendants jointly.

of machine engineering and engineering design. Defendants argue that "lumping a laundry list of generally known broad ranges" does not create a trade secret, nor do mere variations on widely used processes. (Doc. 164, at 65 (citing *Electro-Craft Corp.*, 332 N.W.2d at 899)).

2.        Using servo motors to move frame ends together so as to weld multiple frames together simultaneously is not a trade secret. In support, defendants point to the report of their expert, who opines that the use of servo motors and other precision indexing means for machines is well understood and commonly used in the design and building of machines. In addition to citing their expert, defendants also note that an off-the-shelf 4-point welder, the Urban AKS 8000, has servo motors for positioning the "X and Y axes"; but the subtowers at each of the four corners use pneumatic actuators, which have fixed stops and do not allow for precise control. Replacing these pneumatic actuators with servo motors would be a generally known or readily ascertainable practice in machine design to achieve the desired result.

3.        Etching and stamping of heat plates is well known. In addition to relying on the Faddis report, defendants point to a 1939 patent, U.S. Patent No. 2,152,934, titled "Heat Transmitting Surface" which generally describes radiant heating and discloses that "roughing," "etching" and "stamping" the surface of a heat plate increases the heat of the unit as a whole and permits it to radiate "more rapidly than with a plain external surface." (Doc. 164-28, at 4–5.) To distinguish their claimed secret, plaintiffs offer only the method of using a router "around the edges from right to left or corner to corner, and then changed 90 degrees to repeat the process." However, plaintiffs fail to offer any evidence that there is an economic value derived from keeping this particular method a secret, or that this particular method is not readily ascertainable.

4.       Defendants also argue that the claimed "weld strength and non-touch system" fails to identify a trade secret because there is no more detail in this claimed trade secret than appears in plaintiffs' '720 patent, which publicly discloses a non-touch radiant welding system; and in plaintiffs' marketing prospectus, which describes the radiant system, the resulting weld strength, and the benefits of both. (Docs. 164-6, 164-9.)

To withstand summary judgment, Rule 56 requires plaintiffs to come forward with "specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find [in their favor]." *Adler*, 144 F.3d at 671. Unfortunately, plaintiffs' response offers unconvincing arguments and uncompelling analogies: these are trade secrets because they appear in the Simonton patents; if this information was so readily ascertainable, why did defendants spend "2 years, . . . 10,000 man hours, . . . and $3 million" developing this technology; and this trade secret information is more specific that the information in the Am-Rad patents or the Marketing Prospectus. (Doc. 181, at 86–96, 100–101.)

The only specific evidence upon which plaintiffs rely is the report and testimony of their expert, James Kernell. Mr. Kernell "looked into the elements of a trade secret under the Uniform Trade Secrets Acts . . . and opined that [plaintiffs' claimed trade secrets] [are] trade secret[s]." (Doc. 181, at 97, 100, 101.) Because this appears to be the only actual evidence offered in support of plaintiffs' position regarding the existence of trade secrets, the court addresses the admissibility of this report at this time.

*Admissibility of Mr. Kernell's Testimony and Report*

This court serves a gatekeeper function to determine, under Rule 702, whether expert testimony will assist the trier of fact. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). This two-pronged inquiry requires the party advancing the expert testimony to establish

both its reliability and relevance. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005); *Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2008 WL 170310, at *2 (D. Kan. Jan. 17, 2008); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (recognizing that expert testimony is only admissible "if it is both relevant and reliable.").

Defendants claim, *inter alia*, that Mr. Kernell's testimony will not be helpful to the trier of fact because it usurps both the court's and the jury's roles; and Mr. Kernell is not qualified to opine on machine design or welding plastic materials.

This court has reviewed the report and related documents. Because Mr. Kernell was retained to opine concerning the report of defendants' expert, Terry Faddis, with respect to trade secrets, (and because defendants rely, in part, upon this report in support of their contentions) a brief summary of the Faddis report is appropriate.

According to his own report, Mr. Faddis is Professor of Mechanical Engineering at the University of Kansas, Lawrence, Kansas, specializing in, among other things, machine design. (Doc. 157-1.) Prior to this position, he spent fifteen years in industry in a number of engineering and engineering design positions. He is a named inventor on three United States patents; is an independent engineering consultant; has authored numerous papers; and has testified as an expert in a number of actions involving engineering issues. In reaching his opinions, he reviewed a number of documents and inspected the Urban AKS 800 welders and the modified Urban welders and had discussions with Simonton employees. As to each of plaintiffs' claimed trade secrets, Mr. Faddis opines that, based on his expertise in the field, these are well-known and understood technologies; are readily ascertainable through simple trial and error, which is routine in mechanical engineering design; and, as to some of plaintiffs' claimed trade secrets, are publicly available through plaintiffs'

-23-

own patents.  Ultimately, the Faddis opinion appears to the court to be based on his expertise in the field of mechanical engineering and design.[19]

Mr. Kernell, a local patent attorney with an engineering background, notes that he has not testified as an expert at trial or deposition in the last four years, and has not authored any publications in the last ten.  The report begins by setting out a number of "fatal flaws" in Mr. Faddis' report.  In particular, Mr. Kernell faults Mr. Faddis for opining on whether the information is a trade secret without referring to a definition of a trade secret or the legal elements of a trade secret.  He also faults the Faddis report for failing to analyze the alleged trade secrets as a whole, rather than breaking them into constituent parts; and criticizes Mr. Faddis' comparison of the alleged trade secrets to prior art patents without considering the improvements and particular combinations of elements.

Mr. Kernell's report then sets out a summary of his opinions.  First, he starts his analysis with the definition of a trade secret under the Uniform Trade Secrets Act.  Specifically, he cites the Kansas, Minnesota, and West Virginia statutory definitions, and sets out the elements of a trade secret.  He then sets out "three prominent examples" of trade secrets: the formula for Coca-Cola, Formula 409, and WD-40, all of which are patented in a manner that lists their ingredients, but omits exact concentrations.  He then analyzes each of plaintiffs' claimed trade secrets in turn, and, because he opines that each meet the legal definition of a trade secret, he concludes that "the information

_____

[19]  Plaintiffs' Motion to Exclude Expert Witness Terry Faddis and his Report is based on precisely the reasons this court finds plaintiffs' own expert's report to be inadmissible.  Plaintiffs fault Faddis' methodology for evaluating the alleged "trade secrets" because he does not use the Uniform Trade Secrets Act legal definition of the term.  Although the court would not permit Faddis to tell the jury whether the asserted information was or was not a trade secret, Faddis is qualified to opine concerning whether the asserted information is generally known, publicly available, or readily ascertainable based on his experience in the industry.

identified by plaintiffs and disclosed to defendants is a trade secret." (Doc. 160-3, at 29.)

Defendants' arguments concerning Mr. Kernell's lack of experience in the machine design and vinyl welding industry might affect the weight to be assigned to the opinions rather than their admissibility. *United States v. Varoz*, 740 F.2d 772, 775 (10th Cir. 1984). However, Mr. Kernell's opinions are not based on his experience in the machine design industry. They are based on his purported knowledge of the law. An expert may not simply tell the jury what result it should reach. *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993). This court has serious concerns that the opinions expressed in Mr. Kernell's report (Doc. 160-3) do just that. Further, the opinions rely on legal definitions critical to this case, and thus impede the court's role in setting out the law for the jury. This court will exclude expert testimony that merely states a legal conclusion, usurps the function of the jury in deciding facts, or interferes with the judge in instructing on the law. Such evidence is not helpful to the jury to understand the evidence or to determine a fact in issue. *Id*. at 188–89. Because they do exactly that, Mr. Kernell's testimony and report will not be admissible in this case. To this extent, defendants' motion to exclude is granted. (Doc. 158.)

Other than conclusory statements and citation to the Kernell report, plaintiffs offer no evidentiary support for their assertion that these four subjects—the "method," the use of servo motors, the etching of heat plates, or the weld-strength and non-touch system— constitute trade secrets under applicable law. Setting aside Mr. Kernell's opinions, the court finds that the admissible evidence, viewed in the light most favorable to plaintiffs, is insufficient to demonstrate that any genuine issue of material fact exists as to whether the information cited by plaintiffs indeed constitutes a trade secret. Because no rational jury could find the existence of a trade secret based on the proffered evidence, defendants are entitled to judgment as a matter of law.

In light of the court's ruling, the remaining motions concerning the admissibility of expert

testimony are denied as moot.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 163) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Expert Report and Testimony of James Kernell (Doc. 158) is granted.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Witness Terry Faddis and his Report (Doc. 156), and Plaintiffs' Motion to Exclude the Testimony and Report of Defendants' Expert Steve Browne (Doc. 159) are denied as moot.

This action is dismissed with prejudice.

Dated this <u>26th</u> day of January 2010, at Kansas City, Kansas.

<u>**s/ Carlos Murguia**</u>
**CARLOS MURGUIA**
**United States District Judge**